UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

L.A.S. (XXX-XX-4345)     CIVIL ACTION NO. 18-cv-1498

VERSUS     CHIEF JUDGE HICKS

ANDREW SAUL, COMMISSIONER     MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

L.A.S. ("Plaintiff"), born in 1968, has a high school education and work experience as a truck driver. She applied for disability benefits and pointed to injuries to her left knee, right ankle, neck, and left shoulder. ALJ Ryan Kirzner held an evidentiary hearing and issued a written decision that Plaintiff was disabled from August 13, 2011 through October 15, 2014, but medical improvement ended her disability status after that time. Despite the finding of a closed period of disability, Plaintiff was not entitled to any benefits because that period ended more than 12 months before she filed her application.

The Appeals Council denied a request for review, which made the ALJ's decision the final decision of the Commissioner. Plaintiff then filed this civil action to seek the limited judicial review that is available pursuant to 42 U.S.C. § 405(g). For the reasons that follow, it is recommended that the Commissioner's decision to deny benefits be affirmed.

**Summary of the ALJ's Decision**

The ALJ analyzed Plaintiff's claim under the five-step sequential analysis established in the regulations. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). He found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 13, 2011. At step two, he found that, from August 13, 2011 through October 15, 2014, Plaintiff had the following severe impairments: right ankle and left knee degenerative joint disease and osteoarthritis.

At step three, the ALJ must determine whether the claimant's impairments meet or equal the specifications of any of the detailed listings found in the regulations. If so, the claimant is considered disabled without any need to consider the effect of her age, education, or work skills. The ALJ found that Plaintiff's impairments met the criteria of Listing 1.03 (Reconstructive Surgery of Weight Bearing Joint) from August 13, 2011 through October 15, 2014, but not afterward.

Between steps three and four, the ALJ must assesses the claimant's residual functional capacity ("RFC") by determining the most the claimant can still do despite her limitations. The claimant's RFC is used at steps four and five to determine if the claimant can still do past relevant work or adjust to other jobs that exist in the national economy. The ALJ found that Plaintiff had the RFC to perform light work.[1] She can lift/carry 15-20

---

[1] **Error! Main Document Only.**Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. §§ 404.1567(b) and 416.967(b). The full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. Social Security Ruling 83-10.

pounds occasionally, and she has no limitations in sitting, standing, or walking a full workday.

The ALJ found at step four that Plaintiff's RFC did not allow her to perform her past relevant work; it was medium level. He then turned to step five, which asks whether a person with the claimant's age, education, work experience, and RFC can perform the demands of any other job that is available in significant numbers in the national economy. A vocational expert testified that Plaintiff would be able to perform the requirements of light, unskilled occupations such as fingerprint clerk, price marker, or ticket taker. The ALJ accepted that testimony and found that Plaintiff was not disabled after her closed period ended on October 15, 2014.

**Issues on Appeal**

Plaintiff's brief identifies three issues for appeal:

1. The ALJ erred in failing to find that Plaintiff continued to meet Listing 1.03 after October 15, 2014.

2. The ALJ erred in failing to find that Plaintiff has severe knee, ankle, and other orthopedic conditions that prevent her from performing any jobs that exist in substantial numbers in the national economy.

3. The ALJ erred in failing to appoint an orthopedic consultative examiner to determine the condition of Plaintiff's knee and ankle.

**Standard of Review; Substantial Evidence**

This court's review of the Commissioner's decision is limited to two inquiries: (1) whether the decision is supported by substantial evidence on the record as a whole, and (2) whether the Commissioner applied the proper legal standard. Perez, 415 F.3d at 461. "Substantial evidence is more than a scintilla and less than a preponderance." Masterson

v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). A finding of no substantial evidence is justified only if there are no credible evidentiary choices or medical findings which support the ALJ's determination. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).

**Relevant Evidence**

### A. Hearing Testimony

Plaintiff was 49 at the time of her hearing in October 2017. She testified (Tr. 62-92) that she lives in a small house in Shreveport with her 10-year old nephew. She is a high school graduate and once held a commercial driver's license. She drove an 18-wheeler from 2004 to 2009, when she injured her left knee. She worked for a few months in 2011 answering phones but had to stop working to have her first ankle surgery. She has not been able to return to work since.

Plaintiff told the ALJ that the pain in her knee continued to be a 9 to a 10 out of 10 on the pain scale. She has a lot of swelling and can hear the bones "popping" and "can feel the bones grinding on each other." Her knee is unstable and "gives away" at times, causing her to fall or almost fall at least five or six times per week. She wears a brace for stability some days, but it causes a rash if she wears it too often or too long. Plaintiff testified that she cannot work because of the pain and swelling in her knee and ankle. She has swelling "all the time, from the time I get up till the time I go to bed." When she walks, she has "a lot of popping, a lot of pain." Plaintiff testified that her physicians told her that, because

of the length of time that knee replacements last, she needed to be about 60 before having the surgery. Until then, there was nothing else that they could do for her knee.

Plaintiff testified that she was in a car accident in 2015. She injured her rotator cuff, and a disc in her upper back shifted. This has caused her to have numbness in both arms from her shoulders to her fingers. If she picks up something and holds it for a few minutes, the "numbness will start coming down and I have to . . . put it down." She said that she did not think that she could reach and handle objects for two hours per day. She also has neck pain that she says is a 6 or 7 out of 10 and shoulder pain that she says is a 5 to 6 out of 10.

Plaintiff testified that she is able to take care of personal hygiene, such as brushing her teeth and dressing herself. On a normal day, she helps her nephew get ready and drives him to school. She tries to stay off of her legs throughout the day. She is able to cook "small things" in the microwave or that don't take a lot of time. She does small loads of laundry about every other day. Her nephew does the yard work for her.

Plaintiff estimated that, in an eight-hour day, she needs to elevate her legs for approximately four hours, which means lying down with pillows under her legs. She estimated that she could stand for 15 to 20 minutes at a time for a total of one hour per day. She said that she could only sit for 13 minutes at a time for a total of three hours per day. The rest of the day would be spent reclining or lying down.

Vocational expert Phunda Yarborough testified at the hearing. Tr. 92-99. She said that a hypothetical individual with Plaintiff's work history and education who is limited to light work and is limited to no more than occasionally climbing ladders, ropes, and

scaffolds, no more than occasional need to balance, and no more than four hours walking and standing in a day would be able to work as a fingerprint clerk, price marker, or ticket taker. The individual could still perform those jobs even if she were also limited to no more than frequent reaching, handling, and fingering bilaterally.

Ms. Yarborough said that it would be work preclusive if the individual were unable to sit for more than two hours in an eight-hour workday. It would also preclude work if the person could stand for no more than 10 to 15 minutes at one time and no more than one hour total in a day. The same was true of absences of two or more days per month, the need for recumbency during working hours, and needing at least one additional 15-minute break per day.

### B. Medical Evidence

Plaintiff's right ankle injury was treated by Dr. Stephen Cox of Orthopedic Specialists of Louisiana. He performed a triple arthrodesis (immobilization of the joint by fusion of the adjacent bones) on the ankle in 2011. Tr. 408. In March 2012, he performed a second operation to remove hardware and deep buried screws and to explore the fusion of the ankle. Tr. 397. Plaintiff reported in January 2013 that her biggest problem, about 80%, was her left knee. But the pain and discomfort of the left knee was causing her to rely more on her right leg, which made her right foot and ankle worse. She had some swelling and limitation of the ankle. Tr. 386. In May 2013, Dr. Cox performed a third operation, a subtalar arthrodesis (fusion of the bones in the back of the foot) and Strayer procedure. Tr. 384.

Plaintiff reported to Dr. Cox in January 2014 that she was continuing to have stabbing, throbbing pain. Tr. 367. Dr. Cox wrote that he was "going to submit her for a bone stimulator and see if we can get this thing to fuse rather than have to return to surgery." He noted that Plaintiff was "a lot better than she was before surgery." Tr. 367.

In March 2014, Dr. Cox noted that Plaintiff "is still having significant pain." He said that he did not "think she is able to return to work at this point" or that she was at maximum medical improvement. Tr. 362. Over the next few months, Plaintiff wore a boot to help stabilize the ankle. The boot helped, but Plaintiff continued to report pain and discomfort. Even with the boot on, she was not able to bear full weight on the right foot. Tr. 347.

In July 2014, Plaintiff reported that she was having throbbing and aching, with a lot of swelling at the end of the day. She said she could walk only about 20 minutes before the pain was significant and she had to sit. Her most difficult task was getting up from a seated position. Dr. Cox said that the CT scan indicated the ankle was not fully fused, but he said that Plaintiff was "still making improvements." He was not sure if her pain issue was as good as it would get. He renewed a prescription for Voltaren gel (an anti-inflammatory) and limited Plaintiff to sedentary-type duty because she had difficulty sitting for long periods of time and standing up. Tr. 354.

On September 10, 2014, Plaintiff reported having swelling, aching, and throbbing in the ankle. The Voltaren gel was not helping as much as before. Dr. Cox found some limitation of motion, no instability, and muscle strength of 5/5. He stated that he would not limit her regular activity but noted that "she [is] not able to be up on this for a long

period of time." He put her in a boot for two weeks. Tr. 352. At the next visit, he gave Plaintiff an injection and scheduled a CT scan of the ankle to check for fusion. Tr. 350-51. Dr. Cox noted on October 15, 2014 that the CT had been ordered because Plaintiff reported pain when out of the boot. After reviewing the CT scan, he wrote that there were "some areas that I am concerned may not be fully fused" and "[w]e may have to refuse this." He said that Plaintiff was able to conduct limited regular activities. Tr. 347.

Plaintiff was treated by Dr. Steven Atchsion for her knee injury. She had three injections of hyaluronic acid in her knee in January 2014, but they did not help at all. Tr. 364. In February 2014, Dr. Atchsion wrote in a progress note that "at some point, the patient is going to require a total knee arthroplasty." Tr. 364. The last record from Dr. Atchison was on May 7, 2014. Dr. Atchison reported that Plaintiff "is also being followed by Dr. Cox who is yet to release her to have surgery." Tr. 357.

Plaintiff's claims of neck and shoulder problems stem from an April 2015 auto accident. Tr. 345. An MRI showed that Plaintiff had degenerative joint disease of her AC joint in her shoulder and rotator cuff tendinopathy. Tr. 344. Plaintiff was treated by Dr. Martha Wafer a few days after the accident. Dr. Wafer diagnosed her with cervical strain, left trapezius strain, left clavicular pain, and left arm bicep contusion with hematoma. She prescribed Naproxen. Tr. 530. By June 11, 2015, Dr. Wafer listed the cervical strain, trapezius strain, and clavicular pain as "resolved" and noted that the bicep contusion with hematoma was "improving." Tr. 515-16.

On August 21, 2015, Dr. Wafer listed all of Plaintiff's impairments as "improved" and noted that Plaintiff had "only minor aches and pains currently of the neck and

shoulder." Tr. 507. However, on September 8, 2015, an MRI revealed that Plaintiff had a broad-based disc bulge at the C4-C5 level, leading to mild, bilateral neuroforaminal encroachment. Tr. 501. Dr. Wafer limited Plaintiff to lifting no more than 15 pounds and referred her to Dr. Kerr for further treatment.

Dr. Wafer did not treat Plaintiff after 2015. Counsel sent her a letter in 2017 and asked her to check spaces to indicate Plaintiff's condition as of the last time Wafer treated her. Dr. Wafer checked yes on each of the several questions that asked if Plaintiff had certain limitations. She did not provide any reasons. Tr. 488-89.

Dr. John Danzell is Plaintiff's family medicine doctor. A report from April 1, 2016 stated that Plaintiff had a possible insect bite/poison ivy. The report stated Plaintiff "was cutting a tree," but it did not give any further details. Tr. 485. Dr. Danzell's handwritten progress note from November 22, 2016 lists a strain at the T-1 to T-8 levels, next to what appear to be the words "work yard." Tr. 483.

**C. Consultative Examiner**

The agency sent Plaintiff to see consultative examiner Dr. Janessa Marie Perez-Motlis in July 2016. Plaintiff's physical examination indicated significant improvement since her last doctor visits. Her gait was normal, she was able to rise from a sitting position without assistance, she could stand on her tiptoes and heels, tandem walk without difficulty, and she could squat down and back up without difficulty. Plaintiff had no difficulty ambulating, and her musculoskeletal examination showed no muscle asymmetry or atrophy. Dr. Perez-Motlis noted that Plaintiff's left knee had normal range of motion, it was non-tender, and it had no effusions or swelling. Plaintiff's right ankle had "mild soft

tissue swelling," was non-tender and had no bruising. Dr. Perez-Motlis opined that Plaintiff should be able to walk or stand for a full workday, lift/carry objects approximately 15-20 pounds without limitations, and sit without difficulty. Tr. 449-451.

**Analysis**

### A.  Listing 1.03 after October 15, 2014

Plaintiff argues that the ALJ erred in not finding that her condition continued to meet Listing 1.03 after October 15, 2014. The listings describe levels of impairment related to each of the major body systems. The Commissioner has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of her age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity." Sullivan v. Zebley, 110 S.Ct. 885, 891 (1990); 20 C.F.R. § 404.1525 and § 416.925. Thus, a finding that a claimant's impairment satisfies a listing compels a finding of disabled without any further analysis.

Listings criteria are "demanding and stringent." Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994). A mere diagnosis of a condition will not suffice. The claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." § 404.1525(d); § 416.925(d). The burden of proof rests with a claimant to provide and identify medical signs and laboratory findings that support all criteria for a step three listing determination. Sullivan,110 S.Ct. at 891 ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria").

Listing 1.00 provides generally for disorders of the musculoskeletal system. Listing 1.03 is met when a claimant establishes: "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." The referenced provision for inability to ambulate effectively defines it as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." It "is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." A person can ambulate effectively if she is "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" and has "the ability to travel without companion assistance to and from a place of employment or school." "[E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail."

In September 2014, near the October 15, 2014 end date, Dr. Cox examined Plaintiff's ankle and found some limitation of motion but no instability, and muscle strength of 5/5. He stated that he would not limit Plaintiff's regular activity but "she [is]

not able to be up on this for a long period of time." On October 15, 2014, Dr. Cox reviewed the CT scan and wrote that there were "some areas that I am concerned may not be fully fused" and "[w]e may have to refuse this," but he said that Plaintiff was then able to conduct limited regular activities. Plaintiff did not seek treatment for her left knee after May 2014. In July 2016 Dr. Perez-Motlis found that Plaintiff had a normal gait and "does not require and assistive device for ambulation." She opined that Plaintiff should be able to walk or stand for a full workday and lift/carry objects approximately 15-20 pounds without limitations. The ALJ afforded her opinion "great weight" with respect to the period after October 15, 2014.

Plaintiff certainly has problems with her knee and ankle, but the evidence did not meet her burden of showing that she had the severe limitations on walking required to meet the listing. Plaintiff was able to carry out most activities of daily living without assistance, and there is no evidence she ever needed a walker, crutches or a cane for ambulation after October 15, 2014. There were credible evidentiary choices to support the ALJ's decision that Plaintiff did not meet Listing 1.03 after the closed period, so that decision should be affirmed. Bullock v. Astrue, 277 Fed. Appx. 325, 328 (5th Cir. 2007) (a plaintiff's ability to walk with the use of a single cane, climb stairs with the use of a handrail, and walk two blocks at a time supported ALJ's finding that plaintiff had not shown she was unable to ambulate effectively).

### B. Otherwise Disabled Under the Regulations

Plaintiff's second issue is that the ALJ should have found her disabled under the regulations even if she did not meet the listing. In support, she re-urges her knee and ankle

limitations and adds her neck and shoulder complaints. The knee and ankle issues were discussed above. Plaintiff is plainly limited by them, but the RFC found by the ALJ was a fair assessment.

The ALJ largely discounted the impact of the claimed neck and shoulder limitations, not even including them as severe impairments at step two. Plaintiff did not even mention her neck or shoulder in her disability report when she was asked to list all physical conditions that limit her ability to work. Tr. 278. By April 2015, those issues were largely resolved, and Plaintiff had good range of motion and strength in those areas. The ALJ reviewed the relevant medical records in detail. Tr. 18-19. Plaintiff testified to greater limitations, such as numbness, trouble reaching and fingering, and the need to elevate her legs half a day. The ALJ considered that testimony in his decision. Tr. 16. He did not include the very limited abilities claimed by Plaintiff in his RFC, but the medical evidence did not fully support Plaintiff's claims, and an ALJ's assessment of credibility and the effect of subjective symptoms, based on his first-hand observation of the claimant, is entitled to judicial deference. Johnson v. Bowen, 864 F.2d 340, 347 (5th Cir. 1988); Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994). The ALJ also afforded great weight to the opinion of Dr. Perez-Motlis that Plaintiff could perform light work. Once again, the ALJ's decision should be affirmed because there were credible evidentiary choices to support it.

### C. No Appointment of an Orthopedic Consultative Examiner

At the beginning of the hearing, counsel for Plaintiff asked the ALJ to order an orthopedic consultative exam because of perceived conflicts between a recently obtained report from Dr. Wafer and the report of consultant Dr. Perez-Motlis (a primary care

physician).  At the conclusion of the hearing, counsel for Plaintiff said that "just out of an abundance of caution we would once again reiterate for an orthopedic consultative exam, if the court does not find [the other medical evidence] sufficient on its own."  The ALJ responded that he did not see the need, as there was already a consultative exam from an agency approved physician, but he would review the Wafer report and other new evidence. Tr. 99-100.  Plaintiff argues on appeal that the ALJ erred in not appointing a consultative orthopedic examiner to assess the condition of her knee and ankle.

The ALJ has a duty to fully and fairly develop the relevant facts.  When he fails in that duty, he does not have before him sufficient facts on which to make an informed decision, and his decision is not supported by substantial evidence.  Kane v. Heckler, 731 F.2d 1216, 1219 (5th Cir. 1984).  That duty to undertake a full inquiry, however, "does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision."  Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir.  1989), quoting Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1977)  (emphasis in original).  "The decision to require such an examination is within the discretion of the ALJ."  Pierre, citing Jones v. Bowen, 829 F.2d 524, 526 (5th Cir. 1987).

Plaintiff requested the appointment of an orthopedic consultant because of perceived differences between an assessment by Dr. Wafer and the report of the primary care physician who already issued a consultative report.  The ALJ later reviewed the 2017 Wafer report and elected to afford it "little weight"  because Plaintiff had not seen Dr. Wafer since 2015, the opinions were not supported by any explanation, and the form Wafer

completed allowed no responses other than those that focused on a conclusion of disability. Tr. 19-20. The ALJ had ample other evidence, from treating physicians and the consultative examiner, to fairly assess the claim. Appointment of a specialist was not necessary to render a fair decision. The ALJ was well within his discretion to not order a second consultative exam in these circumstances.

Accordingly,

It is recommended that the Commissioner's decision to deny benefits be affirmed.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 6th day of May, 2020.

Mark L. Hornsby
U.S. Magistrate Judge